Giulio **MUSTO**, et al., Plaintiffs,

v.

**TRANSPORT WORKERS UNION OF AMERICA, AFL–CIO, Local 501 Transport Workers Union of America, AFL–CIO and American Airlines, Defendants.**

**Civil Action No. CV–03–2325 (DGT).**

United States District Court, E.D. New York.

Sept. 27, 2004.

Robert S. Nayberg, Law Offices of Martin H. Scher, Carle Place, NY, for Plaintiffs.

## MEMORANDUM & ORDER

TRAGER, District Judge.

Plaintiffs Giulio Musto, Aurea Avila, Donna Bates, Ana Garcia, Joseph Duncan,

Herbert Carrillo, Agnes Dallas, Dave Denny, Alfonso Ferguson, Angela Taylor Headley, Cameron King, Colin Mayers, Federico Paul, Irwin Roberts, Jose Rodriguez, Renford Scott and Claudine Smith ("plaintiffs") brought this action against defendants Transport Workers Union of America, AFL–CIO ("TWU") and Transport Workers Union of America, Local 501 ("Local 501") (collectively "unions"), as well as American Airlines ("American"), alleging violations of the Railway Labor Act, 45 U.S.C. § 151 *et seq.* ("RLA"). Plaintiffs claim that TWU and Local 501 breached their duty of fair representation by deliberately eliminating their jobs in the course of negotiations with American that led to their being laid off in December 2002, and by failing to represent plaintiffs in their grievances following the layoffs. Plaintiffs further claim that, in December 2002, American improperly laid them off and thereby breached a collective bargaining agreement and certain Letters of Understanding incorporated by that agreement. Accordingly, plaintiffs seek from the unions damages for lost wages, benefits, consequential damages and emotional distress, as well as punitive damages. Plaintiffs also seek that reinstatement by American without any loss of wages, benefits or seniority, and make them whole for loss of wages and benefits.

Pending before the court are (1) defendant TWU's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6); (2) Local 501's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6); and (3) American's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6).

## Background

The following facts are taken from plaintiffs' amended complaint and are presumed to be true for purposes of these motions to dismiss. Plaintiffs are former employees of American who were represented in collective bargaining by the TWU and Local 501. (Amended Complaint ("Am.Compl.") ¶ 26). American and TWU are parties to a collective bargaining agreement covering the "Title II Utility Men" job classification. (Memorandum of Law in Support of Motion to Dismiss Claims Against American Airlines ("Def. American's Mem. of Law"), at 1). American and TWU are also parties to a separate collective bargaining agreement covering "Title III" Fleet Service Clerks. (*Id.* at 1). Local 501 has, on behalf of TWU, administered, for certain purposes, the collective bargaining agreements for Title II and Title III employees at John F. Kennedy International Airport ("JFK") and LaGuardia Airport ("LGA") in New York. (*Id.* at 1).

On August 15, 1995, American and TWU entered into a Letter of Understanding ("the August 1995 letter") which eliminated the "Title II" Building Cleaner and "Title II" Utility Men classifications, except at American's operations at the airport in Tulsa, Oklahoma (TULE). (Am. Compl. ¶¶ 30–31, and Ex. A). The letter provided that "[t]he Company may contract out work formerly performed by Building Cleaners and Utilitymen (except at TULE), after protecting incumbent employees" as outlined in the letter (*Id.*, Ex. A). The letter further stated that "[i]ncumbent Utilitymen will be moved to Plant Maintenance Man positions, if qualified, or to FSC [Title III Fleet Service Clerk] positions, however no employee will be forced to relocate to another station" (*Id.*). This letter of agreement was incorporated into the collective bargaining agreement covering Title II employees in 1995. (Def. American's Mem. of Law, Ex. A, at 8).

On August 15, 1995, plaintiffs Giulio Musto, Aurea Avila, Donna Bates, Ana Garcia, and Joseph Duncan were employed by American in the "Title II" Utility Man classification at LaGuardia Airport. (Am. Compl. ¶ 28). That same day, plaintiffs

Herbert Carrillo, Agnes Dallas, Dave Denny, Alfonso Ferguson, Angela Taylor Headley, Cameron King, Colin Meyers, Frederico Paul, Irwin Roberts, Jose Rodriguez, Renford Scott, and Claudine Smith were employed by American in the "Title II" Utility Man classification at Kennedy Airport. (Am.Compl.¶ 29).

As a result of the August 15, 1995 letter of understanding, the "Title II" Utility Man classification was eliminated to allow for jobs in that classification to be contracted out, and the Utility Men were given the option of transferring to one of three other classifications: (1) the Plaint Maintenance classification, which was also part of the "Title II" group of job classifications; (2) the "Title II" Cabin Cleaner classification (a new position that involved performing some of the work done by Fleet Service employees who were part of the "Title III" classification, but at a lower pay rate than "Title III" Fleet Service employees); or (3) the "Title III" Fleet Service classification (Def. American's Mem. of Law 4). All of the plaintiffs transferred to the "Title II" Cabin Cleaner classification. (Am.Compl.¶ 34).

On September 17, 1996, the System Board of Adjustment ("SBA"), a dispute resolution board required by the RLA and jointly set up by the employer and the union, held a hearing on a grievance brought by the Union on behalf of "Title II" Utility Men who transferred into the "Title II" Cabin Cleaner classification pursuant to the August 1995 letter.[1] The Union grieved the fact that following implementation of the August 1995 agreement the Company was paying former Utility Men now working as Cabin Cleaners lower wages than it had paid before the agreement. On October 16, 1996, the SBA issued an Award ("1996 Arbitration Award"), which reinstated the Title II Utility Man classification and reassigned Title II Cabin Cleaners to a new Title II Utility Cabin Cleaner classification, and provided that they could be "cross-utilized" by doing work in any other classification, so long as they were qualified (Def. American's Mem. of Law 5).

Subsequent to the Award, plaintiffs were cross-utilized by American under the "Title III Fleet Service Clerk" ("FSC") classification (Am.Compl.¶ 35). "At no time since August 15, 1995 have any of the [p]laintiffs performed work other than [Title III] Fleet Service Clerk work." (*Id.* ¶ 37). On December 4, 1997, American Airlines and TWU entered into a Letter of Understanding ("December 1997 letter") designed to permit employees in the plaintiffs' classification to transfer into Title III Fleet Service Clerk positions as vacancies occurred in the Fleet Service Clerk classification. (*Id.* ¶ 38, and Ex. B).

On November 11, 2002, American and TWU signed a Letter of Understanding ("November 2002 letter") in which they agreed to discontinue the Title II Utility Man classification for the performance of Cabin Cleaner work at JFK and LaGuardia (Def. American's Mem of Law 6, and Ex. C). By notice dated November 25, 2002, American informed plaintiffs that, due to a workforce reduction, December 13, 2002 would be their last day of employment as Title II Cabin Cleaners. (Am. Compl. ¶ 40, and Ex. C). American gave plaintiffs the option of filling out an election form by December 2, 2002, but in the end terminated all plaintiffs—even those who filled out and returned the form—with

---

**1.** The 1996 Arbitration Award (M–1607–96) is not explicitly mentioned in the Amended Complaint, nor is the Award attached as an exhibit to the Amended Complaint. However, the Award is implicitly referred to in the Amended Complaint. The text of the Award is attached as an exhibit to American's Memorandum of Law as Ex. B.

the close of their December 13, 2002 shifts. (*Id.* ¶¶ 43–44).

On December 19, 2002, plaintiffs from JFK station submitted their grievances to the Local 501 representative for submission to American, and on December 20, plaintiffs from LGA station submitted theirs. (*Id.* ¶¶ 45–46, and Ex. E). On December 20, American denied the JFK plaintiffs' grievances, and on January 3, 2003, the company denied the LGA plaintiffs' grievances. (*Id.* ¶ 48, and Ex. F). Subsequently, several of the plaintiffs in this action asked officials at Local 501 and at TWU to pursue their claims in arbitration, but the union officials ignored or dismissed these requests (*Id.* ¶¶ 50–56). On May 8, 2003, plaintiffs commenced the instant suit.

## Discussion

### (1)

### Statute of Limitations

■ Initially, defendants argue that plaintiffs' duty of fair representation claim is time barred since the relevant statute of limitations is six months and the claims accrued in 1995 (Memorandum of Defendant Transport Workers Union of America, AFL–CIO in Support of its Motion to Dismiss ("TWU Mem. of Law") 4–6; Defendant Local 501's Memorandum of Law in Support of its Motion to Dismiss the Complaint ("Local 501 Mem. of Law") 6–8). It is indeed well established that the applicable statute of limitations for claims of breach of the duty of fair representation is six months. *See DelCostello v. Int'l Brotherhood of Teamsters*, 462 U.S. 151, 169–71, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983) (holding that six-month limitations period of the National Labor Relations Act applies to claims of breach of duty of fair representation). The six-month statute of limitations for claims of breach of the duty of fair representation also applies to em-

ployees such as plaintiffs who were covered by the Railway Labor Act. *See Gvozdenovic v. United Air Lines, Inc.*, 933 F.2d 1100, 1106 (2d Cir.1991). "[T]he cause of action accrues no later than the time when plaintiffs knew or reasonably should have known that such a breach [of the duty of fair representation] had occurred." *Ramey v. Dist. 141, Int'l Ass'n of Machinists and Aerospace Workers*, No. 99–4341, 2002 WL 32152292, at *6 (E.D.N.Y. Nov. 4, 2002) (Korman, C.J.) (quoting *Cohen v. Flushing Hosp. and Medical Center*, 68 F.3d 64, 67 (2d Cir.1995)), *aff'd* 378 F.3d 269 (2d Cir.2004).

Defendants argue that plaintiffs' claim amounts to a challenge to the seniority system, and that in such an action the statute of limitations begins to run when the seniority system is adopted (e.g. August 1995), not when the results of that system are later felt (TWU Mem. of Law 4; Local 501 Mem. of Law 7). TWU argues that though American Airlines' November 2002 reduction in force may have heightened plaintiffs' job security concerns, the "source of the plaintiffs' apprehension" was the fact that they had been cross-utilized since August 1995 without accruing any Title III seniority (TWU Mem. of Law 6). Local 501 similarly argues that plaintiffs' claim is about lost seniority rights and that, in effect, plaintiffs are alleging that the reason for their termination was Local 501's failure to ensure that plaintiffs had " 'effective seniority' in Title III" when they had no actual Title III seniority as a result of the cross-utilization scheme (Local 501 Mem. of Law 7). As an alternative, American argues that, at the latest, plaintiffs knew from the 1996 Arbitration Award that they could not accrue Title III seniority as Title II Utility workers (Def. American's Mem. of Law 10). Thus, defendants contend that plaintiffs' claims accrued either in August

1995 or in October 1996, when plaintiffs became aware that they would only receive Title II Utility Men seniority while being cross-utilized in Title III Fleet Service Work.

Additionally, Local 501 argues that plaintiffs' allegations that Local 501 arbitrarily refused to pursue arbitration of plaintiffs' 2002 grievances concerning seniority rights are not actionable since the basis for these claims, plaintiffs' lack of Title III occupational seniority, accrued in August 1995 and is also subject to the six-month statute of limitations as of that date (Local 501 Mem. of Law 8).

Defendants' arguments that plaintiffs' claims are time-barred are not persuasive. Defendants point to no agreement stating that plaintiffs would not accrue seniority in Title III as of the date that they commence cross-utilization work for Title III.[2] The August 1995 letter does not address the seniority implications arising from the cross-utilization scheme. That letter agreement did not even establish the cross-utilization scheme. The August 1995 letter specifically required that Utility Men wishing to perform FSC work would have to "move" to those positions: "Incumbent Utilitymen will be moved to Plant Maintenance Man positions, if qualified, or to FSC positions, however no employee

will be forced to relocate to another station." (Am.Compl., Ex. A). In fact, the 1996 Arbitration Award, though it did not actually deal with the question of seniority, observed that employees in the Utility Man position were reluctant to exercise the option of performing FSC work because this would involve transferring to a Title III position and would result in a loss of seniority:

If the Utility Man transferred to Fleet Service, which is a Title III classification, occupational seniority would commence on the day the transfer became effective. . . . Thus, a Utility Man transferring in that manner would lose seniority in bidding for shifts and days off. This fact appears to have reduced considerably the anticipated transfer of Utility Men to the Fleet Service classification. The Company suggested that Utility Men carry their occupation seniority with them into Title III, but the Union found that solution unacceptable because of the backlash it would receive from Title III incumbents.

Def. American's Mem. of Law, Ex. B (1996 Arbitration Award), at 5. The cross-utilization scheme was a product of the 1996 Arbitration Award, which specifically created a system to allow Title II employees

**2.** In opposition to defendants' argument that the six-month statute of limitations began to run in August 1995, plaintiffs argue that the August 15, 1995 Letter is unrelated to the issue of seniority and makes no direct or implied reference to it (Plaintiffs' Memorandum of Law Opposing the Defendant Unions' 12(b)(6) Motions ("Pl.Mem.Opp.Unions") 12). However, plaintiffs are incorrect since Article 10(d) of the CBA does address accrual of seniority when it states that "[a]n employee who changes his Title Group will have his Occupation and Classification seniority dates start on the Saturday prior to his report date to the new Title Group" (Def. American's Mem. of Law, Ex. A, at 44). The August 1995 Letter, therefore, does imply that "mov-

ing" from a Title II to a Title III position would involve loss of seniority under Title II and commencement of accrual of seniority in Title III. As plaintiffs point out, if this were the end of the story, it would only bolster plaintiffs' claim that Title II Utility Men accrued Title III seniority when they began to perform Title III FSC work (Pl. Mem. Opp. Unions 13). However, this aspect of the August 1995 Letter was in fact superceded by the 1996 Arbitration Award when it created the cross-utilization system but left the seniority implications of that system unclear. Thus, plaintiffs are correct to argue that in this instance, "there was no agreement regarding seniority for the plaintiffs to challenge" (*Id.* at 14).

to retain their previously accrued Title II seniority while performing Title III work:

All reinstated Utility Men will be cross-utilized under the terms of the current Agreement to any other classification, where qualified. . . .

. . . . .

Nothing in this Award modifies the original contractual agreement between the parties eliminating the Utility Man classification. Former Utility Man work has been contracted out in many instances. This reclassification does not reinstate that work as being covered by the scope of the Maintenance and Related Agreement, nor does it provide for the Utility Man to perform that work which has been contracted out. As attrition occurs in the Utility Man classification, there will be a diminishing need for the cross-utilization of Utility Men outlined in this decision, and the appropriate classification will perform the work formerly performed on a cross-utilization basis.

*Id.* at 11–12. There is no indication in either the August 1995 letter or in the 1996 Arbitration Award that Title II employees performing Title III work could not accrue Title III seniority while being cross-utilized in a Title III position.

Defendants also argue that the 1996 Arbitration Award made it clear that "Title II were not allowed to go into Title III work if it was going to result in the layoffs of any Title III employees." (Oral Arg. Tr. 11:17–19.) Specifically, defendants are referring to a provision in the 1996 Award which, in establishing the cross-utilization scheme, states that "[w]here there is a recall list for a classification, cross-utilization of Utility Men will not be used to avoid a recall." (Def. American's Mem. of Law, Ex. B, at 11.) There are several problems with this argument. First, as already discussed, the 1996 Arbitration

Award dealt with the issue of disparities in pay between Title II and Title III workers, and thus, it is by no means evident that the discussion of the recall list relates to seniority in a layoff situation. Second, none of the parties addresses the extent of the dissemination of the content of the Award. Defendants have failed to prove that plaintiffs had actual knowledge of the 1996 Arbitration Award, or, alternatively, that plaintiffs had an opportunity to discover the contents of that award. Accordingly, plaintiffs' seniority claims are not time-barred based on the 1996 Arbitration Award.

In response to questions at oral argument about whether there was any event, such as a clash between Title II and Title III workers over vacation days or work schedules, which would have put Title II workers on notice of their seniority status, defendants cannot identify a single instance "in which a seniority dispute arose that put them on actual notice about what [their] seniority was." (Aug. 19, 2004 Oral Argument Tr. ("Oral Arg. Tr.") 8:3–6.) Moreover, defendants fail to reconcile their argument that Title II workers were on notice of their seniority status with letters by union officials indicating that Title II workers had actually been displacing Title III workers in Fleet Service jobs prior to November 2002. An undated letter from Albert Gill, Crew Chief, Fleet Service to Title III workers states that "[w]ith their Title II seniority, [Title II workers] were able to bid [Title III] Fleet Service jobs and even take Crew Chief positions. . . . Title II employees now are exercising their seniority to displace Title III Fleet Service Clerks and Crew Chiefs. This is without a doubt a violation of our seniority . . ." (Am.Compl.Ex.G.) Similarly, a November 2002 letter from the Local 501 President Mochael Chiofalo states that "[a]s members of Fleet Service hit the

street or were displaced to other stations, Title II continues to perform Fleet Service work." (Am.Compl.Ex.H.) Thus, defendants have failed to prove that either the August 1995 Letter of Understanding or the 1996 Arbitration Award created the seniority system that was in effect when the plaintiffs were laid off in 2002.

In support of their arguments, defendants cite several cases. Defendants TWU and Local 501 cite to *Addison v. Piedmont Aviation,* 745 F.Supp. 343 (M.D.N.C.1990), to argue that the statute of limitations for raising a challenge to a seniority system begins to run when that system is established, which is the "source of the plaintiffs' apprehension or injury," not when the impact of that system is felt (TWU Mem. of Law 5; Local 501 Mem of Law 7). TWU and Local 501 also cite to *Hagerman v. United Transportation Union,* 281 F.3d 1189 (10th Cir.2002), for the proposition that "statute of limitations for duty of fair representation claims based on lost seniority rights begins to run when the seniority system is adopted" (Local 501 Mem. of Law 7; *see also* TWU Mem. of Law 5 n. 12). TWU also cites to *Lorance v. AT & T Technologies,* 490 U.S. 900, 109 S.Ct. 2261, 104 L.Ed.2d 961 (1989), as "holding that Title VII challenge to seniority system allegedly adopted with discriminatory intent must be brought when system was adopted, not when the effects are felt" (TWU Mem. of Law 5 n. 12). Finally, TWU cites to *Karder v. Capital Cities/ABC,* No. 88–4127, 1990 WL 186066 (N.D.Ill. Nov. 15, 1990), for the proposition that " '[i]f changes in employment potentially affect a seniority program, an employee is charged with notice of its terms' and 'has the burden of making himself aware' of how his seniority is affected" (TWU Mem. of Law 6 n. 13) (quoting *Karder,* 1990 WL 186066, at *6).

The cases cited by defendant unions in support of their statute of limitations argument are inapposite. As plaintiffs correctly point out (Pl. Mem. Opp. Unions 12), and as discussed above, neither the August 1995 letter agreement nor the 1996 Arbitration Award are related to the issue of seniority. Therefore, cases supporting the argument that a claim challenging a seniority system must be brought when that system is established are irrelevant here. In this case, plaintiffs are claiming that no seniority system was established. Thus, this case involves an instance in which the structure of the seniority only became apparent when American and the unions reached the November 2002 agreement. Accordingly, the statute of limitations began to run with notice of that agreement.

In addition, the seniority claim raised by plaintiffs that is the focus of defendants' statute of limitations argument does not relate to all the issues raised by the grievances plaintiffs asked Local 501 to pursue following the December 2002 layoffs (Pl. Mem. Opp. Unions 20). Thus, plaintiffs contend that "American's implementation of the reduction in force breached the 1995 Letter Agreement and the CBA" and that the resulting "grievances are technically unrelated to the issues of seniority as it could conceivable [sic] arise from the 1995 Letter Agreement" (*Id.*). One such issue relates to whether American breached the CBA by limiting the plaintiffs' relocation option to Tulsa, since Article 15 of the CBA limits relocation to a station in which a vacancy existed in the transferee's classification (*Id.;* Am. Compl., Ex. E, at 2). A second issue relates to whether the Tulsa relocation option violated the language of the August 1995 letter, which states that "no employee will be forced to relocate to another station" (Pl. Mem. Opp. Unions 20; Am. Compl., Ex. E, at 2). A third issue raised by the grievances involves the fact that American was hiring and training re-

placements for plaintiffs as it was laying off the plaintiffs (Pl. Mem. Opp. Unions 21; Am. Compl., Ex. E, at 1–2). Plaintiffs allege that "[t]he Unions refused to take any of these issues to arbitration because a successful arbitration would eviscerate and lay bare the underlying motive of the November 11, 2002 Agreement," which plaintiffs claim was an attempt by the unions to "eliminat[e] the Title II members from JFK and LaGuardia" (Pl. Mem. Opp. Unions 21–22). Although it is clear that the third issue does relate to the seniority claim, the first two issues, which relate to the Tulsa relocation option, have no relation to the seniority question. Even if the grievances related to seniority were time barred—they are not—there is no credible argument to be made that the grievances related to the Tulsa relocation are time barred.

American argues that if the plaintiffs' claim against the Union for breach of a duty of fair representation is dismissed as untimely, plaintiffs' claim against American must also be dismissed (Def. American's Mem. of Law 11). Since plaintiffs' claims are timely, this argument need not be addressed.

### (2)

### Fair Representation Claims Against the Unions

■ A union has a duty to represent fairly all employees subject to the CBA. *See Spellacy v. Airline Pilots Ass'n–Int'l,* 156 F.3d 120, 126 (2d Cir.1998) (citing *Air Line Pilots Ass'n Int'l v. O'Neill,* 499 U.S. 65, 74, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991)). "[A] union breaches the duty of fair representation when its conduct toward a member of the bargaining unit is arbitrary, discriminatory, or in bad faith." *Marquez v. Screen Actors Guild, Inc.,* 525 U.S. 33, 44, 119 S.Ct. 292, 142 L.Ed.2d 242 (1998) (citing *Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967));

*see also O'Neill,* 499 U.S. at 67, 111 S.Ct. 1127 (1991) (holding that rule stated in *Vaca* applies to all union activity, including contract negotiation); *Lewis v. Tuscan Dairy Farms, Inc.,* 25 F.3d 1138 (2d Cir. 1994) (quoting *O'Neill*). "[A] union's actions [may be found] arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational." *O'Neill,* 499 U.S. at 67, 111 S.Ct. 1127 (quoting *Ford Motor Co. v. Huffman,* 345 U.S. 330, 338, 73 S.Ct. 681, 97 L.Ed. 1048 (1953)). Consequently, judicial review of union action " 'must be highly deferential, recognizing the wide latitude that [unions] need for the effective performance of their bargaining responsibilities.' " *Gvozdenovic v. United Air Lines, Inc.,* 933 F.2d 1100, 1106 (2d Cir.1991) (quoting *O'Neill,* 499 U.S. at 78, 111 S.Ct. 1127). "A showing of 'bad faith requires a showing of fraudulent, deceitful, or dishonest action.' " *Sim v. New York Mailers' Union No. 6,* 166 F.3d 465, 472 (2d Cir.1999); *see also Spellacy,* 156 F.3d at 126 ("A union acts in bad faith when it acts with an improper intent, purpose, or motive … Bad faith encompasses fraud, dishonesty, and other intentionally misleading conduct."); *White v. White Rose Food, a Div. of DiGiorgio Corp.,* 237 F.3d 174, 179 (2d Cir.2001) (same).

Plaintiffs claim that the unions breached their duty of fair representation by refusing to process plaintiffs' grievances to the Board of Adjustment (Am.Compl.¶¶ 58–60, 76–77). The Second Circuit has stated that "[a]lthough a union's duty of fair representation does not require it to take every employee grievance to arbitration, 'a union may not arbitrarily ignore a meritorious grievance or process it in perfunctory fashion.' " *Tuscan Dairy Farms,* 25 F.3d at 1143 (quoting *Vaca,* 386 U.S. at 191, 87 S.Ct. 903). Accordingly, where a

union official "failed to follow standard procedures for processing [plaintiff's] demand for arbitration ... this conduct 'constitutes strong evidence of bad faith.'" *Tuscan Dairy Farms*, 25 F.3d at 1143–44 (citation omitted).

In this case, the failure of the unions to pursue plaintiffs' grievances constitutes such evidence of bad faith. Plaintiffs from JFK station submitted their grievances on December 19, 2002, to the Local 501 representative for submission to American, and on December 20, plaintiffs from LGA station submitted theirs. (Am. Compl. ¶¶ 45–46, and Ex. E). Plaintiffs grievances were as follows. First, plaintiffs claimed a breach of the CBA as to their seniority because "[t]he former Utility Men, in effect, have been denied any seniority because they have been assigned work exclusively in a classification (Title III) for which they received no seniority at all" (*Id.* Ex. E, at 3). Second, plaintiffs claimed that the option to relocate them to Tulsa violated the CBA, since Tulsa had no vacancies in their classification, and the CBA requires that the relocation destination must have a vacancy in the same classification (*Id.* Ex. E, at 2). Third, plaintiffs aggrieved the fact that American's relocation option breached the August 1995 letter that eliminated the Title II Utility Man classification and stated that "no employee will be forced to relocate to another station" (*Id.* Ex. E, at 2). The fourth issue was that American continued to hire and train new personnel for the Title III FSC work while laying off the plaintiffs (*Id.* ¶ 84, and Ex. E, at 1–2). More specifically, plaintiffs complained that

> FSC employees with less seniority, who have been performing the same work as the now Utility/Cabin Cleaners since 1995, have not been laid off while the Utility/Cabin Cleaners with greater seniority in the performance of the same FSC work have been laid off. Even employees who have been hired since August 15, 1995, such as the former employees of TWA, were not laid off while Utility/Cabin Cleaners with seniority from at least August 15, 1995, were laid off. Moreover, the Company is currently training existing employees with less seniority and experience to perform the same work that the Utility/Cabin Cleaners have performed and are ready to continue to perform without further training.

(*Id.* Ex. E, at 2).

On December 20, American denied the JFK plaintiffs' grievances, and on January 3, 2003, the company denied the LGA plaintiffs' grievances. (*Id.* ¶ 48, and Ex. F).

On January 6, 2003, plaintiff Federico Paul ("Paul") spoke with Michael Chiofalo ("Chiofalo"), president of Local 501, and requested that Local 501 proceed with taking plaintiffs' grievances to arbitration. Although Chiofalo responded that the Local 501 board would discuss the matter at a meeting scheduled for the next day, no one from Local 501 contacted Paul with any information regarding the grievances. (*Id.* ¶¶ 50–51).

At various times, and finally on February 7, 2003, plaintiff Donna Bates ("Bates") informed TWU, through its Air Transport Division, of the grievances and asked for TWU's help in processing them against American (*Id.* ¶ 53). On February 8, TWU informed Bates that it had no jurisdiction over the grievances and that the matter was within the control of the "Locals." (*Id.* ¶ 54).

On February 4, 2003, plaintiff Agnes Dallas ("Dallas") also asked Chiofalo to take the grievances to arbitration. Chiofalo replied that he would inform her of what action Local 501 would take after he returned from a trip to Texas. (*Id.* ¶ 52).

On February 11, Dallas called Chiofalo since he never contacted her as he said he would. Chiofalo told Dallas he would have an answer on March 7. (*Id.* ¶ 55). On March 7, when Dallas called Chiofalo, he informed her Local 501 "would not do anything and that the Plaintiffs should do what they have to do" (*Id.* ¶ 56).

Based on these facts, plaintiffs adequately allege that the unions' failure to pursue their grievances to arbitration was part of a deliberate bad faith attempt by the union to avoid pursuing plaintiffs' grievances to state a claim for breach of the duty of fair representation.

As part of their argument against plaintiffs' claims relating to the Tulsa relocation option, defendants contend that "it is difficult to see how the plaintiffs were harmed by being offered jobs in Tulsa to which they were not contractually entitled" and that the "supposed non-seniority claims are inextricably tied to [the] stale seniority claims" (Reply Memorandum of Defendant Transport Workers Union of America, AFL–CIO in Further Support of its Motion to Dismiss ("TWU Reply") 6). Another argument advanced by TWU without any explanation is that it is "hard to understand how the plaintiffs continued to view the August 1995 letter agreement as somehow promising them lifetime employment, especially given their admission that in 1995 they knew American was not complying with the letter agreement's provision to move them into 'Plant Maintenance positions, if qualified, or to FSC [Fleet Service Clerk] positions'" (TWU Reply 7).[3] Defendants merely brush aside plaintiffs' non-seniority grievances with conclusory statements. Defendants fail to present a convincing argument that plaintiffs fail to state a claim with regard to harm caused by the unions' failure to pursue to arbitration their grievances about being offered jobs outside their classification in Tulsa, in potential violation of the CBA and the August 1995 Letter agreement. The Tulsa relocation grievances cannot be so easily brushed aside, and defendants fail to present any substantive or procedural opposition to those claims. Thus, plaintiffs' claims alleging that the union failed to pursue the grievances related to the Tulsa relocation cannot be dismissed.

■ Plaintiffs also claim that the unions breached their duty of fair representation by failing to represent plaintiffs during the negotiations over the November 2002 agreement that led to the elimination of their jobs (Am. Compl. ¶¶ 66–68; Pl. Opp. to American's Motion 16). Specifically, plaintiffs allege that Local 501 "intentionally, deliberately and surreptitiously negotiated with the Defendant American Airlines with the express purpose of sacrificing the Plaintiffs' job protection they had based upon the 1995 Letter of Understanding and reached an agreement on November 11, 2002" (Amend Compl. ¶ 66). Plaintiffs also allege that the TWU breached its duty to the extent that it "permitted or otherwise

---

**3.** In fact, it is not unreasonable for plaintiffs to argue that "[w]ere the Plaintiffs' arguments to prevail in arbitration the reduction in force rules would force American to keep the Title II personnel until they retire because there would be nowhere else in the system to send them" (Pl. Mem. Opp. Unions 21). After all, the 1996 Arbitration Award stated that "[a]s attrition occurs in the Utility Man classification, there will be a diminishing need for the cross-utilization of Utility Men outlined in this decision, and the appropriate classification will perform the work formerly performed on a cross-utilization basis" (Def. American's Mem of Law, Ex. B, at 11–12). The Arbitrator's implication that the Title II Utility Man classification could only be phased out by attrition does indeed suggest that the Title II Utility Man classification could not be eliminated simply due to a lack of work in that classification.

acquiesced in the non-enforcement of the Plaintiffs' rights under the CBA" (Am. Compl.¶ 79). In support of this claim, plaintiffs cite to the November 18, 2002 letter from Local 501 President Michael Chiofalo to the Local 501 Membership, in which he boasts that 31 Fleet Service jobs have been added while Title II members who had performed Fleet Service work "would be given RIF option sheets to exercise their contractual right to displace another Title II member or fill a vacancy in their classification just as the Title III Fleet Service group does when there is a reduction in force" (Am.Compl., Ex. H). The stated basis for this action was that "[a]s members of Fleet Service hit the street or were displaced to other stations, Title II continues to perform Fleet Service work" (*Id.*). The 1996 Arbitration Award states that in negotiating the August 1995 agreement, "[t]he Company suggested that Utility Men carry their occupation seniority with them into Title III, but the Union found that solution unacceptable because of the backlash it would receive from Title III incumbents" (Def. American's Mem. of Law, Ex. B (1996 Arbitration Award), at 5).

When viewed in light of Chiofalo's letter and the 1996 Arbitration Award, which is referenced in Chiofalo's letter, plaintiffs' claims and the supporting evidence attached to their amended complaint make a prima facie case of bad faith and discrimination by the union, thereby successfully stating a claim for breach of the duty of fair representation due to the unions' failure to represent the interest of plaintiffs' during the November 2002 contract negotiations with American. *See Ramey v. District 141, Int'l Assoc. of Machinists and Aerospace Workers*, 378 F.3d 269, 277 (2d Cir.2004) (" '[A] union may not, without a legitimate purpose, take action favoring some of its members at the expense of others.' Additionally, 'a union violates [its duty] when it causes an employer to discriminate against employees on arbitrary, hostile, or bad faith grounds.' Although our review of a union's collective bargaining 'must be highly deferential [and must] recogniz[e] the wide latitude that [unions] need for the effective performance of their bargaining responsibilities,' 'a union may not juggle the seniority roster for no reason other than to advance one group of employees over another' or to punish a disfavored group." (citations omitted)).

It appears that the union was placed in a difficult position in its need to represent the interests of both Title II and Title III workers. On the one hand, Title II positions had been phased out, and the cross-utilization scheme allowed Title II workers to keep working despite the gradual elimination of their former positions. However, the employment of Title II workers in Title III positions came at the expense of job opportunities for Title III workers. As American was attempting to cut costs so as to avoid bankruptcy, it subcontracted out a great deal of work. (Oral Arg. Tr. 18:11–20:8). It appears that union officials were under pressure to reach an agreement with American for subcontracting of some jobs to non-union workers, and the Union may well have had to give up some jobs for the benefit of the larger union membership. At the same time, it appears that the unions and American agreed in November 2002 to lay off all remaining Title II workers, which certainly leaves open the possibility that Title II workers were discriminated against. It is quite possible that Local 501 had a legitimate reason to focus on the elimination of Title II jobs. Nonetheless, plaintiffs do present sufficient evidence at this stage to support the claim that the Union was acting with animus against Title II workers and favoring Title III workers because the elimination of Title II positions presented

a politically easier solution to the union leadership. These are all areas which require further exploration in discovery, and which will certainly be relevant upon a motion for summary judgment in determining the validity of plaintiffs' claims against the unions for breach of the duty of fair representation. At this point, however, dismissal of the action against the unions is premature.

Accordingly, the unions' motions to dismiss, with the exception of those relating to punitive damages claims as discussed in section (3) below, are denied.

### (3)

### Punitive Damages

■ Defendants argue that even if plaintiffs state a timely claim for which relief can be granted, plaintiffs' demands for punitive damages against the unions must be dismissed as a matter of law. Plaintiffs demand punitive damages against defendants TWU and Local 501 for alleged intentional misconduct in the amount of no less than $1 million (Am. Compl.¶¶ 70, 81). It is well established law that punitive damages against unions are unavailable in duty of fair representation cases. *See Int'l Brotherhood of Electric Workers v. Foust*, 442 U.S. 42, 52, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979) (holding that punitive damages may not be assessed against union that breaches its duty of fair representation by failing to properly pursue a grievance). Plaintiffs concede that as to the claim regarding the union's failure to properly pursue grievances, *Foust* appears to control (Pl. Mem. Opp. Unions 23). However, plaintiffs argue that they also made an allegation regarding the Union's negotiation of the November 2002 letter agreement with America that resulted in their termination, and that *Foust* does not preclude punitive damages with regard to the negotiations claim (*Id.* at 22–23). Although the duty of fair representa-

tion "applies to all union activity, including contract negotiation." *Air Line Pilots Ass'n v. O'Neill*, 499 U.S. 65, 67, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991), plaintiffs present several novel arguments as to why *Foust* should not be applied in the negotiations context. However, they do not cite a single case to support the theory that *Foust* does not preclude punitive damages in a breach of duty of fair representation claim arising out of a contract negotiation.

Defendants argue that much of the reasoning in *Foust* extends to all duty of fair representation cases, not just those involving failure to pursue a grievance (TWU Reply 8). Defendants are correct. *Foust* states that punitive damages would threaten to "deplete union treasuries, thereby impairing the effectiveness of unions as collective-bargaining agents" (442 U.S. at 50, 99 S.Ct. 2121), and concludes that "general labor policy disfavors punishment, and the adverse consequences of punitive damages awards could be substantial," (*Id.* at 52, 99 S.Ct. 2121). This logic certainly extends to duty of fair representation claims based on contract negotiations. *See, e.g., Farmer v. ARA Services, Inc.*, 660 F.2d 1096 (6th Cir.1981) (applying *Foust* to reverse a district court's award of punitive damages against union while affirming award of backpay and damages for emotional and mental distress based on district court's finding that during negotiation sessions union breached its duty of fair representation under §§ 8(b), 9(a) of the Labor Management Relations Act of 1947). Accordingly, plaintiffs' claims for punitive damages against the unions must be dismissed.

### (4)

### Hybrid Claim against American Airlines

■ Plaintiffs claim that defendant employer American Airlines is liable to them

as a party to the unions' alleged breach of the duty of fair representation. Specifically, plaintiffs claim that American breached the relevant CBA and certain letters of understanding it incorporates (specifically the August 1995 letter and the December 1997 letter) and that they have been damaged by those breaches (Am.Compl.¶¶ 83–91). Defendant American Airlines argues that [p]laintiffs' claims that it "breached the pertinent CBA and certain Letters of Understanding, taken alone, are 'minor disputes' under the RLA" and that such disputes are "subject to the exclusive jurisdiction of the grievance and arbitration procedures established by the collective bargaining agreement, and the exclusive jurisdiction of 'adjustment boards' mandated by the RLA" (Def. American's Mem. of Law 11).

As this suit is governed by the RLA, section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, is inapplicable. "In cases not governed by the RLA, employees may bring 'hybrid' actions against a union for breach of a collective bargaining agreement and, under § 301 of the [LMRA], against an employer for breach of a collective bargaining agreement." *Bove v. Long Island R.R.,* No. 93–4032, 1995 WL 901990, at *3 (E.D.N.Y. Dec. 12, 1995) (referring, as example, to *DelCostello v. In'l Bhd. Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983)). However, "[t]he RLA does not contain any provision analogous to § 301 of the Labor Management Relations Act, which grants federal courts broad jurisdiction over suits for violations of collective bargaining agreements," *Bove,* 1995 WL 901990, at *3. Therefore, in cases

governed by the RLA, federal courts "do not have general subject matter jurisdiction to adjudicate disputes arising from a breach of a collective bargaining agreement." *Id.* Nevertheless, "in RLA cases, it is well recognized that courts may, in certain circumstances, exercise jurisdiction over both a union and an employer in an action alleging a breach of the duty of fair representation." *Id.*

Although it is clear that hybrid actions may be brought under the RLA, it is unclear whether the employer is always a proper party to such an action. American argues that in order to state a claim against an employer in an RLA hybrid action, plaintiffs must present "evidence that the employer colluded with, conspired in, or contributed to the union's breach" (American Airlines' Reply Memorandum in Support of Motion to Dismiss Claims Against American Airlines ("American's Reply") 3–5; *see also* Def. American's Mem. of Law 15–16 (both briefs rely primarily on *Raus v. Bhd. of Ry. Carmen,* 663 F.2d 791 (8th Cir.1981), and *Robinson v. Nat'l R.R. Passenger Corp.,* No. 93–8376, 1995 WL 444322 (S.D.N.Y. July 26, 1995))).[4] Plaintiffs oppose defendants interpretation that there is "an especially high standard [for] breach of contract claims in hybrid actions" (Pl. Mem. Opp. Unions 17) and argue that "[t]he employer is made a party to the [hybrid] claim to secure the availability of the relief that the representative failed to pursue" (Plaintiffs' Memorandum of Law Opposing the Defendant American Airlines' 12(b)(6) Motion ("Pl. Opp. to American's Mem. of Law") 10) (citing to *Steffens v. Bhd. of Railway,*

---

4. American also suggests that *O'Mara v. Erie Lackawanna R. Co.,* 407 F.2d 674 (2d Cir. 1969), *aff'd Czosek v. O'Mara,* 397 U.S. 25, 90 S.Ct. 770, 25 L.Ed.2d 21 (1970), accords with *Robinson* and *Raus* (Def. American's Mem. of Law 15). However, as plaintiffs argue (Pl.

Opp. to American 18–20), and as the following discussion explains, neither the circuit court opinion in *O'Mara,* nor the Supreme Court decision affirming that decision, supports American's interpretation.

*Airline and Steamship Clerks, Freight Handlers, Express and Station Employees*, 797 F.2d 442 (7th Cir.1986)). However, plaintiffs fail to state an affirmative rule as to when an employer may be made a party to a hybrid action.

The Supreme Court, in affirming a decision of the Second Circuit holding that "[w]here the employer's action is only a consequence of the union's discriminatory conduct, or takes the form of joint discrimination with the union, then plaintiffs should be allowed to join the employer and the union in one action," *O'Mara*, 407 F.2d at 677 (citations omitted), did not resolve the question of when an employer is a proper party:

> [W]e have no occasion to consider whether, under federal law, which governs in cases like these, the employer may always be sued with the union when a single series of events gives rise to claims against the employer for breach of contract and against the union for breach of the duty of fair representation, or whether, as the Court of Appeals held, when there are no allegations tying union and employer together, the union is suable in the District Court for breach of duty but resort must be had to the Adjustment Board for a remedy against the employer.

*Czosek*, 397 U.S. at 29–30, 90 S.Ct. 770 (quoted in *Bove*, 1995 WL 901990, at *4).

It remains unclear whether the employer is always a proper party to a hybrid suit under the RLA. *See Steffens*, 797 F.2d 442 ("There is disagreement over whether the plaintiff needs to allege that the employer is in some way involved in the union's

breach"); *Graf v. Elgin, Joliet and Eastern Ry. Co.*, 697 F.2d 771, 781 (7th Cir. 1983) ("The choice between confining the worker to arbitral remedies that may be worth nothing to him because the union failed to prosecute his grievance in timely fashion and allowing him to prosecute his grievance in court upon proving that the union breached its duty of fair representation is not a happy one.... We need not choose between these approaches since [plaintiff] failed to prove a breach of the union's duty.").

None of the parties identifies a definitive rule in the Second Circuit on this issue. However, in *Schum v. South Buffalo Ry.*, 496 F.2d 328 (2d Cir.1974), the Second Circuit held that where the union breached its duty of fair representation by failing to file a timely grievance on behalf of the employee, a union member could bring a suit against the employer for wrongful discharge in violation of the collective bargaining agreement.[5] The *Schum* panel adopted the reasoning of the Supreme Court in *Vaca*:

> 'It is true that employer in such a situation may have done nothing to prevent exhaustion of the exclusive contractual remedies to which he agreed in the collective bargaining agreement. But the employer has committed a wrongful discharge in breach of that agreement, a breach which could be remedied through the grievance process to the employee-plaintiff's benefit were it not for the union's breach of its statutory duty of fair representation to the employee. To leave the employee remediless in such circumstances would in our opinion, be a

---

5. *Cf. Raus*, 663 F.2d at 798 (holding that the applicability of the exception to the exhaustion requirement in RLA hybrid cases is limited to cases in which there are "good faith allegations and facts support those allegations indicating collusion or otherwise tying the [carrier] and the union together in allegedly arbitrary, discriminatory or bad faith conduct amounting to a breach of the duty of fair representation."); *Robinson*, 1995 WL 444322, at *8 (following *Raus* ).

great injustice. We cannot believe that Congress, in conferring upon employers and unions the power to establish exclusive grievance procedures intended to confer upon unions such unlimited discretion to deprive injured employees of all remedies for breach of contract. Nor do we think that Congress intended to shield employers from the natural consequences of their breaches of bargaining agreements by wrongful union conduct in the enforcement of such agreements.' *Schum,* 496 F.2d at 332 (quoting *Vaca,* 386 U.S. at 185–85, 87 S.Ct. 903). Following *Schum,* several courts in this circuit have held that hybrid suits are an exception to the exhaustion requirement and that a showing of collusion between union and employer is not necessary. *See, e.g., Bove,* 1995 WL 901990, at *4 ("[C]ourts do have jurisdiction over a claim for a breach of a collective bargaining agreement when such a claim is inextricably linked to a claim that union has breached its duty of fair representation."); *Ince v. Nat'l R.R. Passenger Corp.,* 693 F.Supp. 1466 (S.D.N.Y. 1988) (applying principle that " '[h]ybrid' suits against a union for breach of duty of fair representation and an employer for violation of the collective bargaining agreement are exceptions to the exhaustion requirement," and holding upon motion for summary judgment that court has jurisdiction over employer although "there is no evidence of an overt agreement [between employer and union] to deprive plaintiff of his rights").

Under *Schum,* in order to determine whether plaintiff states a valid hybrid claim against American Airlines, all that is necessary is to determine whether the unions breached their duty of fair representation. Plaintiffs are correct in arguing that they need not prove that the employer colluded with the unions in their fair representation breach. Moreover, if plaintiffs state a claim against the unions for breach of the duty of fair representation, they need not prove exhaustion of remedies in order to bring a claim against American.

Since plaintiffs state a claim against the unions for breach of the duty of representation, they can bring a hybrid claim against American for breach of the CBA. Defendant American's argument that plaintiffs' claims are "minor disputes" subject to the exclusive jurisdiction of grievance and arbitration procedures under the CBA and of the RLA arbitration boards is incorrect. The cases cited by American in support of its argument are not persuasive. American cites *Hawaiian Airlines v. Norris,* 512 U.S. 246, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994) for the proposition that a minor dispute "must be resolved only through the RLA [alternative dispute resolution] mechanisms." *Id.* (quoted in Def. American's Mem. of Law 11). American also cites *Robinson v. Transworld Airlines,* 947 F.2d 40 (2d Cir.1991) for the same proposition (Def. American's Mem. of Law 11). As plaintiffs point out, *Hawaiian Airlines* was not a hybrid case, and thus is irrelevant (Pl. Opp. to American's Mem. of Law 12). *Robinson v. Transworld Airlines* is also easily distinguishable since it involves an attempt by the plaintiff to have a federal court review a determination of the RLA-mandated Adjustment Board. Defendants fail to argue against the well-established rule that hybrid claims constitute an exception to the general rule under which federal courts do not have subject matter jurisdiction over minor claims. In this instance, the court has subject matter jurisdiction.

Defendants also argue that a hybrid action may only be brought against an employer where "good faith allegations indicating collusion or otherwise tying the [employer] and the union together in allegedly arbitrary, discriminatory, or bad faith conduct amounting to a breach of fair representation." (Def. American's Mem. of Law 15) (citing *Robinson,* 1995 WL 444322

(quoting *Raus,* 663 F.2d at 798)). As already explained, the rule stated in *Raus,* and quoted in *Robinson,* is not the law of this circuit. Plaintiffs need not allege collusion or conspiracy. Plaintiffs only need to show that the union's alleged failure to represent is "inextricably linked" to the employer's alleged breach of the CBA.

Moreover, even if the rule stated in *Raus* were the law of this circuit, it is possible that discovery will reveal that the unions acted deliberately against Title II employees who were being cross-utilized in FSC positions, which, in turn, would implicate American since it negotiated with the unions to eliminate the Title II Utility Man classification. Thus, to the extent plaintiffs might have been required to allege collusion, their claim would still survive American's motion to dismiss. After discovery, it is possible that plaintiffs may have a claim against American for bad faith collusion with the unions in discriminating against Title II employees. *See O'Mara,* 407 F.2d at 679 ("[I]n a suit against a union for 'hostile discrimination' the employer can be joined as a party defendant if it 'acted from a motive to discriminate or with knowledge that the (union) was discriminating.' Where the employer's action is only a consequence of the union's discriminatory conduct, or takes the form of joint discrimination with the union, then plaintiffs should be allowed to join the employer and the union in one action.").

■ In addition to the jurisdictional argument, defendant American contends that plaintiffs fail to state a colorable claim for breach of the CBA. American argues that plaintiffs "claim the 'right' to Title III seniority based on their cross-utilization in (Title II) Fleet Service positions," but that "[n]o agreement between American and TWU has ever created such a 'right,' and American cannot breach an agreement that never existed" (Def. American Mem.

of Law 12). Furthermore, American argues that "[t]he essence of Plaintiffs' dispute is not that American breached an existing agreement but rather the absence of any agreement between American and TWU which permitted Title II Utility Men to accrue Title III seniority" (Def. American Mem. of Law 14).

As plaintiffs point out, American seems to have missed the essence of their breach of contract claim. Plaintiffs claim that "even though American and the Unions may have the authority to enter into the November 11, 2002 Agreement whose objective was the elimination of the Plaintiffs' jobs, the implementation of the Agreement's objective must still comply with the CBA's provisions related to layoffs, transfers and seniority. Those articles were not altered by the November 11, 2002 Agreement" (Pl. Opp to American's Mem. of Law 14). Thus, plaintiffs allege that implementation of the November 2002 violated their rights under the CBA relating to layoffs, transfers, and seniority.

The facts alleged by plaintiffs as to the breach of contract claim against American are as follows. On November 11, 2002, American and TWU signed a Letter of Understanding ("November 2002 letter") in which they agreed to discontinue the Title II Utility Man classification for the performance of Cabin Cleaner work at JFK and LaGuardia (Def. Mem of Law 6, and Ex. C). The letter provided that "[s]ince the Utility employees affected by the reduction in force at JFK and LGA are system job protected, they will be offered . . . a full time Utility Man position at TULE [in Tulsa, Oklahoma]. In addition, they will be provided other options in accordance with Article 15 [of the CBA]." (*Id.,* Ex. C). The November 2002 letter further provides that "an equivalent number of Title III—Fleet Service positions will be created to perform the work that the current Utility Men are performing.

In addition, the Cabin Cleaning work will be performed by the Title III—Fleet Service classification prospectively" (*Id.*).

By notice dated November 25, 2002, American informed plaintiffs that, due to a workforce reduction, December 13, 2002 would be their last day of employment as Title II Cabin Cleaners. (Am. Compl. ¶ 40, and Ex. C). The notice included instructions and an election form where each plaintiff could exercise his or her seniority by December 2, 2002. (*Id.*) All of the plaintiffs timely submitted their election forms and, with the exception of Renford Scott, chose to exercise their seniority to be placed or transferred in a Title III Fleet Service Clerk position at their respective stations (i.e., LaGuardia or Kennedy Airports). (*Id.* ¶ 42, and Ex. D). American, however, rejected each plaintiff's choice to be transferred to the Title III Service Clerk classification, and terminated the plaintiffs with the close of their December 13, 2002 shifts. (*Id.* ¶¶ 43–44).

Although plaintiffs do not clearly articulate in their Memorandum of Law the basis for their breach of contract claims, the nature of those claims is evident from the Amended Complaint. Plaintiffs state a prima facie claim based on the fact that American's requirement that plaintiffs relocate to a station that did not have vacancies in their classification is a breach of article 15(b)(3) of the CBA, which permits an employee to "exercise his seniority to fill a vacancy at another station in his classification, as well as a violation of the August 1995 letter agreement (Am. Compl. ¶¶ 83, 86, and Ex. E, at 2; Pl. Opp. to American's Mem. of Law 5)." In addition, plaintiffs state a colorable claim that American breached the CBA by retaining Title III Fleet Service Clerks who had less seniority than they and fewer years performing Fleet Service work, and by hiring new personnel for the FSC positions while laying off plaintiffs (Am. Compl. ¶ 84, Pl.

Opp. to American's Mem. of Law 4–6). In essence plaintiffs were whipsawed. Following the August 1995 letter agreement, plaintiffs chose to stay in Title II positions so as not to lose seniority. Then by exercising the choice to retain seniority, the November 2002 agreement left them with no claim to seniority at all. At the very least, there is a colorable claim for breach of the CBA based on these allegations.

Accordingly, American's motion to dismiss is denied.

### Conclusion

For the foregoing reasons, defendants TWU and Local 501's motions to dismiss are denied in part and granted to the extent that plaintiff's claims for punitive damages against the unions must be dismissed. Defendant American's motion to dismiss is denied.

SO ORDERED.